E-FILED
Friday, 21 December, 2012  04:55:25 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **JOANN WIREY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 10-CV-02216** |
| **v.** | ) | |
| | ) | |
| **RICHLAND COMMUNITY COLLEGE,** | ) | |
| | ) | **FILED** |
| **Defendant.** | ) | |
| | ) | **DEC 21 2012** |

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

### OPINION

This is an employment discrimination case. Plaintiff claims that after she sought to not work overtime due to her chronic fatigue syndrome, Defendant first discriminated against her due to her health condition, and then eventually terminated her employment, in contravention of the Family Medical Leave Act and the Americans with Disabilities Act.

The case is before the court on Defendant's Motion for Summary Judgment (#35). This court has carefully reviewed the briefs and exhibits submitted. Following this review, Defendant's motion is GRANTED.

### JURISDICTION

This court has federal question jurisdiction, 28 U.S.C. § 1331, pursuant to the Family Medical Leave Act of 1993 ("FMLA"), 28 U.S.C. § 2601, *et seq.*, and the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101, *et seq.*

### BACKGROUND

Plaintiff Joann Wirey was formerly employed by Defendant, Richland Community College. She was first employed as a records clerk in 1995, and then after a series of advancements, was promoted to the position of Registrar and Director of Registration and Admissions in 2004. As Registrar, Plaintiff was the head of the office responsible for processing student applications, maintaining accurate class and grade records, verifying student residency, and serving as the primary point of contact for students in obtaining class schedules, registering for courses, dropping and adding classes, and obtaining grades, transcripts, and diplomas. In 2004, Cheryl Blahnick was Plaintiff's direct supervisor. Blahnick reported to Jane Johnson, the vice president of Student and Academic Services. In 2007, Marcus Brown became the Dean of Enrollment Services of the College, thereby making him Plaintiff's direct superior. Before 2007, John Bell was the Director of Human Resources. Bell was replaced by Richard Gschwend as Director in 2007.

## A. Previous medical condition

Plaintiff claims she was diagnosed with mononucleosis in January, 2007 and was intermittently unable to return to work through May, 2007, but provides no supporting evidence for that assertion. In July, 2007, Plaintiff's physician provided a letter indicating that Plaintiff was "being treated for ongoing medical problems and during the course of her treatment she may experience periodic unpredictable work absences related to her illness." (#38, Exh. 2, WIREY00602). Although no documentation provided indicates that Plaintiff's condition was chronic fatigue syndrome (CFS), she attests to that fact in her deposition (#38, Wirey Dep. 27) and Defendant does not dispute it (#39 ¶¶ 20, 21).

Regarding who was on notice of Plaintiff's condition, Plaintiff notified Bell, the then-Director of Human Resources, in 2007, that she might have to miss work from time to time and they discussed the FMLA. On August 1, 2007, Bell sent Plaintiff a memo indicating that her "condition qualifies as a personal serious medical condition as defined by the FMLA," and that she was required to "note on [her] Request for Time Off form 'FMLA time' in addition to checking the 'vacation', 'sick time' or 'personal' time box." (#38, Exh. 3, WIREY00563). On Plaintiff's physician's letter, there are two names handwritten: S. Blahnik and J. Johnson, although neither has the letter been authenticated nor is there any direct, non-hearsay evidence showing that those two individuals did in fact receive or were otherwise on notice of the contents of the letter. Plaintiff also avers that she notified Deborah McGee, the "HR person," that she had CFS, as a general matter, but also that she never informed McGee that she was taking leave for a specific occasion. McGee's affidavit specifically states that she has no personal knowledge of any disability or medical condition affecting Plaintiff. (#36, Exh. G ¶ 13).

Furthermore, Brown and Gschwend provided affidavits averring that they had not been aware of the precise nature of Plaintiff's disability until they reviewed the allegations in her Complaint filed in the present matter (#36 ¶ 80). Plaintiff does not dispute that assertion. However, Gschwend was aware that Plaintiff's condition limited her to "not work[ing] weekends" (#36, Exh. H 67-68). In addition, Johnson admits that while she did not know the nature of Plaintiff's condition or that she had a qualified disability (#36, Exh. D ¶ 24), she did know in 2007 that Plaintiff had "some problem" regarding her health (#38, Johnson Dep. 32).

Plaintiff admits that although she was diagnosed with CFS, she was not, at any relevant time, taking medication for it (#36, Wirey Dep. 23). Further, she admits that her condition was not so severe as to interfere with her work. Plaintiff states that she rarely missed work or left

early due to the condition (#36, Wirey Dep. 24), and that when she did miss work, she made up the time later (#36, Wirey Dep. 28).  Finally, Plaintiff admits that she never requested officially-designated FMLA leave for her CFS (#36, Wirey Dep. 29).

## B. Alleged precipitating event

In the beginning of every semester, the Office of Admissions would be open for certain evenings and Saturdays in order to better service the students who could not visit during the week. Plaintiff worked on some of those evenings, but declined to work on the Saturdays, purportedly because of her medical condition. On July 30, 2009, Brown wrote Plaintiff an email stating, "Is it your intention to be the only staff person in the division not working on one of the Saturdays?" Plaintiff replied that she was making a presentation to the adjunct faculty on August 8, 2009, and further noted that she "do[es] not like to sign up for extra because of [her] health." In response, Brown stated that he "expect[s] all staff, particularly directors, to assist with the Saturdays we are open and this expectation extends to you. Anything short of meeting this expectation will be considered insubordination."

On August 5, 2009, Plaintiff received a note from her physician indicating that she was being treated for a health issue, and that she had been instructed not to overextend herself by working weekends or long days. That note was purportedly sent via a chain of emails to Brown, Gschwend, and Johnson. (#38, Exh. 10). However, strangely, neither Plaintiff nor Defendant will admit to the authenticity of that note or acknowledge that any individual on the chain had seen it. (#36, Exh. B, Wirey Dep. 62; #39 ¶ 40). Furthermore, Plaintiff does not contest Defendant's statement of fact that Johnson, Brown, and Gschwend were unaware of Plaintiff's condition, including CFS, until they reviewed the complaint in the present litigation. (#36 ¶ 80; #38 p.2).

- 4 -

Following this notice, Plaintiff did not sign up for any Saturday shifts. Plaintiff was not officially disciplined for not taking any Saturday shifts.

## C. Proffered performance issues and termination

On October 14, 2009, Gschwend sent Plaintiff a letter terminating her employment. There were three separate incidents that Defendant cited to justify Plaintiff's termination. First, on August 8, 2009, Plaintiff gave a presentation to incoming adjunct faculty on the College's admission process. During the presentation, Plaintiff explained that the College had a policy of requiring a sponsor letter attesting to the fact that the student had the funds to matriculate and that they knew the student. According to Jane Johnson, one new faculty member, Kevin Collins, complained that Plaintiff had said that the letters were required in response to the 9/11 disaster. The Adjunct Faculty Coordinator received an email from Collins indicating that he felt that the comment was offensive and inappropriate.[1]

Second, during the second week of August 2009, an unidentified Richland employee complained to the Office of the President that Plaintiff had taken an inappropriate photograph

---

[1] In her filings, Plaintiff seeks to muddy the waters with vague allegations of some kind of conspiracy against her. Plaintiff merely alleges that Brown is Collins's domestic partner and that Brown is the son of a close friend of Johnson, but provides neither argument nor evidence that these relationships somehow have been leveraged to effectuate termination. Similarly, during her adverse deposition, when shown an email acquired during discovery that *she herself* purportedly wrote and sent, the following colloquy ensued:

> Q [Defendant]: You've been handed Exhibit 10. This appears to be a string of E-mails, but let me direct you to the bottom of page one. Does this appear to be an E-mail that you sent to Marcus Brown on August 7, 2009?
> A [Plaintiff]: I don't know. This looks like it's typed on a piece of paper. I don't know if it's an E-mail or not.
> Q: Do you have any reason to doubt the authenticity of this E-mail?
> A: I have reason to doubt every document you present that I do not have a copy of.
> Q: And why is that?
> A: Because certain people at Richland Community College do unethical and illegal things.

(#36, Wirey Dep. 62).

- 5 -

with a student. That photo shows Plaintiff standing with a male student. The student is to Plaintiff's left and has his right arm around her shoulder, with his left arm akimbo. He is smiling and looking upward. She has her left arm in a position that appears to be on his back or waist. She is also smiling. Her right hand is holding onto the hem on the right side of his T-shirt and pulling it away from his body, the tension thereby causing the shirt to be lifted from his body, thus exposing several inches of his bare stomach, and exposing less than an inch of his underwear above the top hem of his pants. The photo was taken in July 2009 at the request of the student, but Plaintiff admits that the student did not specifically ask that she manipulate his shirt.

On August 12, 2009, Brown had a meeting with Plaintiff. On August 20, 2009, Brown issued Plaintiff a verbal warning over those two incidents. He also issued a disciplinary action report to Plaintiff, which indicated that "future performance issues of any nature will result in a disciplinary reprimand, suspension, and/or possible termination of employment." Plaintiff refused to sign the report.

There was a third incident after the report, but Defendant indicates that while Plaintiff was suspended with pay during the investigation, it did not contribute to Plaintiff's termination. In September 2009, Johnson received a complaint from a parent of a College student who complained that Plaintiff had been rude to her. The parent alleged that she had requested to view her student-son's grades and to talk to his professors, pursuant to a written FERPA release that the student had supposedly completed, but Plaintiff refused to give the parent access, noting that the student had either not completed the release or had subsequently revoked the release. Gschwend initiated an investigation and placed Plaintiff on administrative leave with pay pending the resolution of the complaint. The report resulting from the investigation indicated that there was no evidence that Plaintiff had coerced the student into denying his parent access to his

records, and that the findings as to whether Plaintiff had been rude to the parent were inconclusive, given that the only evidence was two highly conflicting testimonies and no other record. Defendant admits that this incident did not factor into the decision to terminate Plaintiff (#39 ¶ 65).

Last, while Plaintiff was on administrative leave, a faculty member alleged that Plaintiff might have incorrectly changed a grade for the student with whom she had taken the inappropriate photograph. Johnson investigated the incident and found no supporting documentation for two of the student's grade changes, in contravention of standard operating policy. However, when she contacted the professors in those two classes, one professor confirmed that he had made the change, and the other indicated that he "vaguely remember[ed]" that he had made the change. However, by this time, Johnson had already initiated a global investigation of all the grade changes performed by Plaintiff's office during the preceding two years. Johnson found that between 2007 and 2009, Plaintiff had personally made changes to grades for eight students for which documentation could not be found, while the combined office staff had made changes to grades for 22 students for which documentation could not be found.

Brown and Gschwend became concerned about the integrity of the Office's record-keeping, and offered Plaintiff a Final Job Warning and Employee Action Plan Agreement. Among other conditions, the terms of the agreement included the following clauses:

> 4. As a condition of continued employment, [Plaintiff] will be responsible for the following outcomes.
>
> [* * *]
>
> > e. [...] Any actions or communications taken to undermine the operating effectiveness of the Dean will be grounds for immediate dismissal, as will Failure to Follow Supervisory Instructions and Insubordination.

- 7 -

f. Similarly, future dealings with Student Records staff, students, community members, and other College representatives must be handled in a constructive, positive, and professional manner. Disruptive behavior will not be tolerated, and will be ground [*sic*] for dismissal.

6. [Plaintiff] agrees not to contest this disciplinary action and, further, that the discipline [*sic*] action taken on August 20 is also to be considered final. [Plaintiff] understands that this agreement is in lieu of termination of employment and fully resolves and all related issues.

(#38, Exh. 24). When Plaintiff did not agree to the terms of the Employee Action Plan

Agreement, Gschwend terminated her employment on October 14, 2009.

## D. Procedural history

On September 10, 2010, Plaintiff filed her complaint in this case. Discovery began on

February 3, 2011. Several motions for extension of time to complete discovery were granted. On

March 20, 2012, Defendant filed the present Motion for Summary Judgment. On April 23, 2012,

Plaintiff filed her Response with exhibits, and on May 7, 2012, Defendant filed its Reply. In her

Response, Plaintiff does not substantially dispute any of the facts proffered in Defendant's

statement of facts. On June 12, 2012, this court vacated the dates for the final pretrial

conference' and the jury trial dates.

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for

summary judgment, a district court has one task and one task only: to decide, based upon the

evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v.*

*Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)*.* In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). In her complaint, Plaintiff claims that Defendant violated the FMLA (Count I) and the ADA (Count II). We begin by addressing the lengthier analysis, the ADA claim.

## I. ADA claim

Although there are two types of ADA claims, discrimination on the basis of a disability, 42 U.S.C. § 12112, and a failure to accommodate, 42 U.S.C. § 12112(b)(5)(A), Plaintiff's Complaint does not clearly set out which of the two (or both) that she seeks to pursue. "It is important for plaintiffs to be clear about whether they are pressing disparate treatment or failure-to-accommodate claims (or both) because the two are analyzed differently." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006). This court concludes that Plaintiff pursues a discrimination claim, given that she alleges that Defendant treated non-disabled employees differently for substantially similar actions, and does not allege that Defendant failed to provide any reasonable accommodations that she requested (#1 ¶¶ 68-72).

"[A] plaintiff may prove discrimination in violation of the ADA using one of two methods. Under the direct method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). Plaintiff neither argues nor has provided any direct evidence, and therefore, cannot sustain her case under the direct method.

## A. *Prima facie* case

The alternative way to prove discrimination is the familiar burden-shifting *McDonnell Douglas* indirect method.

> Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of intentional discrimination. Once the plaintiff establishes a prima facie case, a legal, rebuttable presumption of discrimination arises, and a burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. If the employer satisfies that burden, the presumption of discrimination extinguishes, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence, but a mere pretext for intentional discrimination.

*Nawrot v. CPC Int'l*, 277 F.3d 896, 905 (7th Cir. 2002) (citations and editing marks omitted). To establish a *prima facie* case of disability discrimination under the ADA in the employment context, a plaintiff must prove that 1) she is disabled within the meaning of the ADA, 2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and 3) she suffered from an adverse employment action because of her disability. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012).

### 1. Disability

Regarding the first element, the ADA requires that the term "disability" means: a) a physical or mental impairment that substantially limits one or more major life activities of such individual; b) a record of such an impairment; or c) being regarded as having such an impairment. 42 U.S.C. § 12102. Notably, the ADA was amended in 2008 to make the standard for qualifying as disabled more inclusive. ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, effective January 1, 2009. In 2008, Congress found that the

Supreme Court had improperly narrowed the protection intended to be afforded under the ADA, and enacted the ADAAA to abrogate the holdings in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999) and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002). This court recognizes that, following the 2008 amendments to the ADA, the term "substantially limits" is to be construed broadly in favor of expansive coverage. *See* 29 C.F.R. § 1630.2(j)(1)(i). Because the events in this case occurred after January 1, 2009, the amendments apply.

Applying the three-step process discussed in *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998), this court finds that, for the purpose of the present Motion for Summary Judgment, Plaintiff qualifies as having a disability under the first prong, which is to say that she has "a physical or mental impairment that substantially limits one or more major life activities of such individual." First, CFS may, categorically, qualify as a disability under *Bragdon* because it produces physical and mental impairments. *See, e.g., Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir. 2002); *E.E.O.C. v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 615 (5th Cir. 2009). The only evidence that Plaintiff produced that she was even diagnosed with CFS is in her own testimony during her adverse deposition. (#36, Exh. B, 22:6-8; 24:5-6; 33:4-9). Plaintiff has provided this court with no medical records or even a note from her physician with that diagnosis. At best, her physician's notes merely indicate that she was "being treated for a health issue" (#38, Exh. 10) or for "ongoing medical problems" (#38, Exh. 2). However, because this court must construe the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in her favor, and because Defendant does not in fact deny that Plaintiff has CFS, this court concludes, for the purpose of this motion, that Plaintiff may be treated as having CFS.

Second, the life activities that Plaintiff has identified are those of working, thinking, and

concentrating. These constitute acceptable life activities for the ADA. 42 U.S.C. § 12102(2)(A).

Third and last, the "determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv). An impairment is a disability within the meaning of the ADA "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "[I]n making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv). The individualized analysis requires Plaintiff to show that she was in fact affected by the condition to the degree that a major life activity was substantially limited. *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000) ("It is not enough, however, for [Plaintiff] to demonstrate that she suffers from depression. To get past summary judgment, she must also demonstrate in the record that *her* depression substantially limits *her* ability to perform a major life activity. In every case our inquiry is individualized.") (emphasis in original).

Here, Plaintiff demonstrates that her condition substantially limits two major life activities. First, she states that "My mom had to come down to let out my dogs, feed my dogs. She'd bring in my mail. I wouldn't do laundry. I might get up just to take a bite of something and then I'd be back down." (#36, Exh. B, 22:21-23:1). Second, she states that her chronic fatigue interfered with her ability to remain awake and alert, and it "knocked [her] out" so she couldn't concentrate. (#38, Wirey Dep. 270-271). Defendant argues that Plaintiff's alleged CFS could not possibly have limited her major life activity of working, since a) Plaintiff never took officially sanction FMLA leave during her bouts of fatigue; and b) rarely missed work or left early because of CFS. Defendant also cites to *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) in

support of this proposition. In *Durley*, the Eleventh Circuit upheld the district court's finding that because the plaintiff there testified that she "was able to perform the job... [and] the work got done always," that she was not disabled within the meaning of the statute. This court disagrees. First, *Durley* was decided before the passage of the ADAAA, which specifically mandates that the definition of disability shall be broadened. Second, requiring an individual with a physical or mental impairment to miss work or leave early in order to qualify for a disability would encourage that individual to be absent from work in order to demonstrate that they suffered from a disability. This is an absurd result, and accordingly, no credit may be given to Defendant's argument. Thus, because this court must construe the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in her favor, this opinion proceeds, for the purpose of the present Motion for Summary Judgment, by presuming that Plaintiff's CFS constitutes a disability that substantially limited the major life activities of thinking and concentrating. (#39 ¶¶ 20-21). As Plaintiff qualifies as being disabled under the first prong, any analysis under the second or third prongs, which are a record of such an impairment or being regarded as having such an impairment, is unnecessary.


### B. Qualified to perform essential functions

The second element of the *prima facie* case is that the plaintiff was qualified to perform the essential functions of her job, either with or without a reasonable accommodation. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). This requires that the individual be qualified for the position. 42 U.S.C. § 12112(a); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). To determine whether a person is a "qualified individual" under the ADA, courts undertake a two-part inquiry and consider whether, at the time of the termination decision, the

employee: 1) satisfied the employer's legitimate selection criterion for the job; and 2) was capable of performing the job's "essential functions" with or without reasonable accommodation from an employer. *Hammel*, 407 F.3d at 862. Plaintiff adequately performed her job at the College for fifteen years, at least five of which were in her final position as the Director and Registrar. This only goes to the first part of the inquiry; that is, it demonstrates that she had the requisite skills, education, and experience to complete the requirements of the job. Second, Plaintiff may be arguing that she was terminated because she refused to work several Saturdays out of every semester (although it is not clear as her Response simply does not address the ADA issue, and instead makes vague accusations about improper timing under the FMLA). In Defendant's favor, courts have acknowledged that, in general, "attendance is a requirement of a job," and that the "Act does not protect people... from being fired because of illness." *Waggoner v. Olin Corp.*, 169 F.3d 481, 483-84 (7th Cir. 1999). On the other hand, Defendant has made it clear that it was College policy to provide student services for several Saturdays at the beginning of each semester, and that it was necessary and essential that the offices were open for those several days. This element further requires that a reasonable accommodation must be made to the individual if it enables her to perform the job. 42 U.S.C. § 12111(8); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999). The burden is on the plaintiff to show that she can meet these requirements. *Waggoner*, 169 F.3d at 484. Neither party has suggested that Plaintiff sought a reasonable accommodation, much less proposed that Defendant denied such a request. But a hypothetical resolution would not have been inconceivable wherein Plaintiff takes off a Friday in order to work the following Saturday, given Plaintiff's own testimony that Defendant found it acceptable for her to occasionally take several hours off in the middle of the day to rest as long as she made them up later in the evening. Therefore, because this court must construe the

- 14 -

evidence in the light most favorable to Plaintiff and draw all reasonable inferences in her favor,

because the evidence suggests that she was qualified at the time her employment was terminated,

and that it is unclear whether any reasonable accommodations were requested or given, this

opinion proceeds, for the purpose of the present Motion for Summary Judgment, by presuming

that Plaintiff was qualified to perform the essential functions of her position.

### C. Adverse employment action because of disability

Finally, Plaintiff must show that she suffered from an adverse employment action

because of her disability. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). Plaintiff's

employment at the College was terminated, so the requirement of an adverse employment event

was fulfilled. However, as the action must have occurred *because of* the disability, or as the

statute and regulation reads, "on the basis of disability", 42 U.S.C. § 12112(a); 29 C.F.R. §

1630.4(a)(1), there is an additional requirement that the employer must have knowledge of the

employee's disability before it engaged in the adverse employment action. As the Seventh

Circuit has opined:

> We think that an employer cannot be liable under the ADA for firing an
> employee when it indisputably had no knowledge of the disability. This is
> supported both by simple logic and by the conclusions of other courts that
> have considered analogous issues.
>
> At the most basic level, it is intuitively clear when viewing the ADA's
> language in a straightforward manner that an employer cannot fire an
> employee "because of" a disability unless it knows of the disability. If it does
> not know of the disability, the employer is firing the employee "because of"
> some other reason.

*Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). Defendant argues that it

could not have possibly discriminated against her on the basis of her disability because no one at

the College who was responsible for the termination had knowledge that Plaintiff had a

disability. Certainly, Johnson, Brown, and Gschwend asseverate that they were not aware that

Plaintiff suffered from a medical condition, much less CFS or any other illness protected by the

ADA. (#36 ¶ 80). Brown was the Dean of Enrollment Services; in that role, he was Plaintiff's

direct supervisor at the time. (#36, Exh. E., Brown Aff. ¶ 1). Johnson was the Vice President of

Student and Academic Services (#36, Exh. D, Johnson Aff., ¶ 1), and as such, was Brown's

direct supervisor. (#39, Johnson Dep. 12:11-18). Gschwend was the Assistant Director of Human

Resources, and the person evaluating and ultimately signing off on Plaintiff's termination. (#36,

Exh. H., Gschwend Dep., 7:3-10).

However, the parties do not dispute that Plaintiff received a memo from Human

Resources. That memo read, in pertinent part, as follows:

> To: JoAnn Wirey, Director of Admissions and Records
> From: John Bell, Director of Human Resources
> Date: August 1, 2007
> Subject: FMLA Leave
>
> On July 30, 2007, you notified me of your need to potentially miss scheduled
> work time on an unpredictable basis due to an ongoing medical condition.
> Your condition qualifies as a personal serious medical condition as defined by
> the FMLA. Consequently, the College is required to accurately track any
> further scheduled work time missed as a result of this specific condition.
> [* * * ]
> If you do, in fact, miss any further scheduled work time as a result of this
> specific condition, it will be important that you note on your Request for Time
> Off form "FMLA time" in addition to checking the "vacation", "sick time" or
> "personal" time box. You may be required to furnish further medical
> certification of your condition in the future. If this is required, I will notify
> you and you will have 15 days to provide the required certification.

(#38 Exh. 3). The parties do not suggest that Plaintiff was ever required to furnish further

medical certification of her condition. Plaintiff avers that the memo was copied to Johnson;

Defendant contests only that it is hearsay but neither asserts nor provides testimony that Johnson

did not actually receive a copy of that memo.

- 16 -

Additionally, Plaintiff claims that she notified Deborah McGee, "the HR person", around the same time, about her condition and her potential for needing to take leave. (#38, Wirey Dep., 25:14-26:10). Curiously, Defendant accepts this assertion as undisputed (#39 ¶ 19) even though McGee's affidavit indicates that she had no personal knowledge of any medical condition or disability affecting Plaintiff (#36 Exh. G, McGee Aff. ¶ 13). In 2009, McGee was the Director of Student Development (#36 Exh. G, McGee Aff. ¶ 1). It is not clear what position in Human Resources McGee held in 2007, if any, when Plaintiff purportedly notified her.

Last, Plaintiff claims that Brown, Johnson, and Gschwend all received a copy of a physician's note indicating that she should not work weekends or long hours, on August 7 or 8, 2009. This memo states, in pertinent part, as follows:

> August 5, 2009
> To Whom It May Concern:
> Joann is currently being treated for a health issue by this office. We have instructed her not to overextend herself at work or with other activities. At this time, she should not be working weekends or long days. She should be allowed to judge and determine her limitations in regard to her workday.

Plaintiff provides an email chain showing that the memo was received by Brown and Johnson. (#38, Exh. 10). Defendant, oddly, declines to admit that the presence of this email chain indicates that the note was received by either Brown or Johnson, but does not dispute its authenticity. (#39 ¶ 40).

The 2007 memo shows that John Bell, the predecessor to Gschwend, who was the ultimate decision-maker, was on notice of Plaintiff's disability. But Gschwend's affidavit indicates that he was not aware of the substance of this memo. There are significant issues raised by mandating actual knowledge in order to sustain a *prima facie* claim of disability discrimination, including, among others, the incentives created if an employer has no duty to communicate knowledge about employee disability to management-level decision-making

executives. *See generally*, *Schuler v. SuperValu, Inc.*, 336 F.3d 702 (8th Cir. 2003); *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 877 (9th Cir. 1989); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1184 (11th Cir. 2005). No case law directly on point could be found as to whether the requirement of actual knowledge could be satisfied by imputed knowledge between successor individuals holding the same position. This result is due to the ADA's language forbidding an adverse employment action occurring "because of" the disability, rather than forbidding such actions occurring "in spite of" the disability.

However, the court need not address those issues at this time. The 2009 memo and email chain, if true, indicates that Brown, Johnson, and Gschwend received notice that Plaintiff had a disability that prevented her from working long hours or on weekends. Defendant denies that they received that email. This is a genuine issue of material fact regarding whether Defendant had actual knowledge, and thus, could have discharged Plaintiff "because of" her refusal to work weekends. Taking the facts in favor of Plaintiff as the non-movant, the burden of production to offer a nondiscriminatory reason for the discharge shifts to the moving party. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012).

## II. Employer's burden to provide a legitimate, nondiscriminatory reason

Having established a *prima facie* case, taking all Plaintiff's alleged facts to be true, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Nawrot v. CPC Int'l*, 277 F.3d 896, 905 (7th Cir. 2002) (citations and editing marks omitted). As the *Nawrot* court stated:

> Without direct evidence of pretext (*e.g.*, an admission), a plaintiff may show pretext by presenting evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. But pretext

requires more than a showing that the decision was mistaken, ill-considered or foolish, and so long as the employer honestly believed those reasons, pretext has not been shown. We have warned repeatedly that we do not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision. With that admonishment, however, we have also stated that we need not abandon good reason and common sense in assessing an employer's actions."

*Nawrot*, 277 F.3d at 906. Turning to this case, Plaintiff is unable to demonstrate pretext in Defendant's proffered legitimate, nondiscriminatory reasons for her termination. Defendant provides three factors and one ultimate reason for Plaintiff's termination. The three factors are two incidents of inappropriate behavior (the 9/11 comments and the student photograph) and one continuing pattern of professional neglect (the missing grad change records). The ultimate reason of termination was Plaintiff's refusal to agree to the Employee Action Plan Agreement. Plaintiff does not deny that both incidents and her failure to correctly maintain records occurred, nor does she deny that she refused to sign the Agreement, but rather, seeks to either justify her actions or show that Defendant purportedly treated other similarly situated individuals differently, thereby demonstrating discrimination toward her. Plaintiff may demonstrate pretext by showing that "the two employees dealt with the same supervisor, were subject to the same standards, *and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (emphasis in original.)

Regarding the 9/11 comments, Plaintiff asserts that Kevin Collins, the new faculty member who reported her for those comments, and who was Brown's domestic partner, sent out an inappropriate email to several members of the staff. Defendant disputes that the email was "wildly inappropriate", but the submitted documents show that three cartoons were attached to the email, the contents of which were of an overtly sexual nature. (#38, WIREY000010-11).

- 19 -

There was no evidence presented that Collins was disciplined in any manner for those emails. However, Plaintiff was not verbally warned for this factor alone, but rather for this incident combined with the inappropriate photograph. (#36 ¶ 26).

Regarding the photograph, Defendant offers no similarly situated individual who interacted with students in an inappropriate manner. The court finds that the photograph is professionally inappropriate for a student-administrator relationship.[2] Plaintiff was only issued a verbal warning for the combination of her behavior in the photo as well as for her 9/11 comment, because "the photograph was not appropriate or professional, especially in consideration of [Plaintiff's] role at the College, and [Plaintiff's] September 11 comment was flippant, offensive, and unprofessional." (#36 ¶ 26) (editing marks omitted).

Regarding the grade changes, Plaintiff asserts that "Brown admits that not all grade changes are accompanied by the proper form" (#38 ¶ 72) and that "Brown admits that he made a grade change for a professor without the proper documentation" (#38 ¶ 73). Defendant contests this claim. Brown's testimony instead states that for that particular grade change, he changed the grade after talking to the professor and put a note in the student's file. In contrast, Defendant noted that there were a number of grade changes conducted under Plaintiff's watch that had *no* documentation at all. (#36 ¶¶ 46, 47, 56-62). This court therefore agrees with Defendant. The discussion also goes to Plaintiff's accusation that "[n]o evidence was developed to indicate that JoAnn was improperly changing grades for students." (#38 ¶ 71). Plaintiff misunderstands this factor in the calculus leading to her termination of employment; it is not that she had improperly changed grades, but rather, that she had failed either to require or record proper documentation at

---

[2] If there is any doubt, consider swapping the genders—suppose that an older male administrator in the office tasked with keeping track of student grades, consents to a photo with a younger female student in which her midriff and underclothing are exposed and the administrator is touching her shirt.

- 20 -

the time of the grade change or to properly maintain that documentation after the change

occurred. (#36 ¶¶ 55, 56).

     And finally, the ultimate cause of Plaintiff's termination of employment was the final

precipitating event. Gschwend testified as follows:

> The cause of the termination was irregularity in documentations that would
> support grade changes at the college, and that led to a meeting which we had
> hoped would lead to [Plaintiff] staying with the college under a performance
> improvement plan and under a warning status. The cooperation that we were
> hoping through that dialogue did not happen. So ultimately, it was the choice
> not to participate in those performance improvement plans that led to the
> ultimate decision.

(#36, Gschwend Dep., 9:19-10:3). As in *Nawrot*, Plaintiff's actual termination was not for her

history of misconduct or professional negligence, but rather for the ultimate event: there,

harassing a co-worker and assisting her in arbitration against the employer-defendant,

disregarding his duty of loyalty to the company; and here, Plaintiff's refusal to participate in the

Employee Action Plan Agreement. *Nawrot v. CPC Int'l*, 277 F.3d 896, 907 (7th Cir. 2002). The

Agreement provided Plaintiff with one last chance to retain employment. In return, she would:

refrain from insubordination; handle her future dealings with staff, students, community

members, and other College representatives in a professional manner; and not contest the

disciplinary action. But again, like in *Nawrot*, where "[a]fter numerous documented occasions of

inappropriate behavior, [the Defendant employer] demanded that [the employee] straighten up

and fly right, and instead he crashed and burned," Plaintiff was given one final chance to perform

at the levels required but did not bother to even try. *Nawrot*, 277 F.3d at 907.

     This court is permitted to grant summary judgment in an ADA claim when the plaintiff

fails to establish that the defendant's proffered reason for the subsequent termination was

pretextual. *Dyrek v. Garvey*, 334 F.3d 590, 599 (7th Cir. 2003); *Nawrot v. CPC Int'l*, 277 F.3d

896, 907 (7th Cir. 2002). Here, viewed in the light most favorable to Plaintiff, there is no evidence from which a reasonable trier of fact could conclude that Defendant's proffered reason for Plaintiff's termination was pretextual. Not only did Plaintiff engage in objectively unprofessional behavior and fail to perform to the professional standards required by Defendant, but also affirmatively declined Defendant's last opportunity to retain her employment. These are not unreasonable expectations for employment as a high-level administrator at a college. Therefore, she was not meeting Defendant's legitimate expectations. Further, Plaintiff could provide no comparator employee who had engaged in similar behavior but was not disciplined. Accordingly, this court grants summary judgment in favor of Defendant on Plaintiff's ADA claim.

## II. FMLA claim

Although Plaintiff does not clearly say so in her filings, she appears to be bringing a FMLA claim for wrongful termination under both an interference theory (that Defendant interfered with her exercise of her right to FMLA leave) and a retaliation theory (that Defendant retaliated against her taking FMLA leave by terminating her employment.) (#38 pp. 19-20). *See Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Although Defendant interprets Plaintiff's filings solely as a retaliation theory, this court addresses both theories out of an abundance of caution.

Under the FMLA, an eligible employee is entitled to 12 work-weeks of leave in any 12-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(D) (held unconstitutional as to abrogating States' immunity from suit for damages in accordance with 29 U.S.C.

§2617(a)(2), pursuant to *Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327, 1337, 182

L. Ed. 2d 296 (2012)).

As a threshold matter, an independent roadblock to Plaintiff's case under either theory is

that she failed to provide any notice to Defendant at the point where she sought to take medical

leave. The CFR requires that "[a]n employee shall provide at least verbal notice sufficient to

make the employer aware that the employee needs FMLA–qualifying leave, and the anticipated

timing and duration of the leave." 29 C.F.R. § 825.302(c). The form of notice does not require

any "magic words", and in fact, does not even need to invoke the FMLA. *Dotson v. Pfizer, Inc.*,

558 F.3d 284, 293 (4th Cir. 2009) (noting the "generally-accepted position that no 'magic words'

are necessary to invoke the protections of the FMLA."). However, an employee seeking leave for

self-care under § 2612(a)(1)(D) "shall provide the employer with not less than 30 days' notice,

*before the date the leave is to begin*, of the employee's intention to take leave under such

subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days,

the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B) (emphasis

added). Further, in order to trigger an employer's duties, the employee must provide "the sort of

notice that will inform them ... that the FMLA may apply. For leave to be FMLA-qualifying, it

must first result from a serious health condition." *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d

308, 311 (7th Cir. 2006) (editing marks omitted). Plaintiff's own deposition testimony belies any

argument that she ever took FMLA leave, much less provided the statutorily-required notice that

she sought to take such leave. In her deposition, she testified as follows:

> Q [Defendant]. Okay. Mr. Bell notified you in this memo that your condition
>     qualified as a serious health condition under the FMLA, correct?
> A [Plaintiff]. Yes.
> Q. And any work time missed because of this condition would qualify as
>     FMLA leave, correct?
> A. Correct.

Q.  He also asks you to note on any leave request form "FMLA time" when asking for time off because of this condition, correct?

A.  Correct.

Q.  And it's a customary practice at Richland for an employee to complete a Request for Time Off Form when asking for sick or vacation leave, correct?

A.  Correct.

Q.  After receiving this memo, did you ever need time off because of your condition?

A.  No.

Q.  The condition being chronic fatigue syndrome?

A.  That is correct, no, I did not need time off.

[* * *]

Q.  When you needed time off because of this condition, you never noted on your request form that your illness was for FMLA time, correct?

A.  Correct, because I never took time off for it. If I adjusted my schedule, then I made up the time.

Q.  So then you never took FMLA leave for your condition?

A.  Correct. There was no need to.

(#38, Wirey Dep., 27:9-29:2). Because Plaintiff stated that she never actually took FMLA time off, much less notified Defendant that she was going to do so, her failure to provide sufficient notice is dispositive. In the interest of completeness, this opinion proceeds by presuming that either her 2007 or 2009 memos constituted sufficient notice and addressing the remaining merits.

To prevail on an interference theory, Plaintiff must show that: (1) she was eligible for FMLA protection; (2) Defendant was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) Defendant denied her benefits to which she was entitled. *Ryl-Kuchar v. Care Centers, Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009); *see* 29 C.F.R. § 825.220(a)(1) ("An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act."); § 825.220(c) ("The Act's prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised

or attempted to exercise FMLA rights.")

The only allusion Plaintiff makes that Defendant "interfered", or otherwise attempted to coerce her to not exercise her rights is her allegation that Brown demanded she take a Saturday shift or face a charge of insubordination. (#38 p. 19). But this assertion must fail because the sequence of events is illogical. Brown first required Plaintiff to work Saturdays, and only afterwards did Plaintiff provide a medical reason in the 2009 memo, much less notice that might alert Defendant to inquire as to whether FMLA leave was being invoked. Up until the point where Plaintiff said she was taking off Saturdays because of her health reasons, it would have appeared to Defendant that she was simply engaging in absenteeism. Plaintiff does not allege that Defendant denied her any rights after she provided the 2009 memo. Accordingly, her FMLA claim under an interference theory fails.

"A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly. Under the direct method of proof, the plaintiff must have sufficient evidence, direct or circumstantial, that her employer intended to punish her for requesting or taking FMLA leave. Additionally, the plaintiff can try to prove retaliatory intent indirectly by showing that she was performing her job satisfactorily but was treated differently from similarly situated employees who did not request FMLA leave." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012). Regarding the first method, Plaintiff has no direct or circumstantial evidence that Defendant intended to punish her for taking FMLA leave. It is clear that there is no direct evidence. As for circumstantial evidence, Plaintiff suggests that the case is all about "timing". Plaintiff argues in her Response that the fact that her termination occurred within two-and-one-half months after her seeking FMLA leave (which, as discussed above, was not sufficient to trigger Defendant's FMLA duties) is sufficient to raise an inference that

Plaintiff's termination was due to retaliatory intent. This court disagrees. Suspicious timing alone is rarely sufficient in and of itself to create a triable issue. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). "Close temporal proximity provides evidence of causation, and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." *Lang v. Illinois Dept. of Children & Family Services*, 361 F.3d 416, 419 (7th Cir. 2004). The Seventh Circuit has held that even shorter periods are insufficient, on their own, to sustain an inference of retaliatory intent. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval, combined with performance deficiencies, insufficient to withstand summary judgment); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (two months insufficient); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (one month insufficient). There were 76 days, or two months and 14 days, between the email exchange and Plaintiff's termination. As Defendant has argued, a gap of two-and-one-half months between an employee's alleged protected activity and her termination of employment is too attenuated, as a matter of law, to circumstantially establish a causal link between those events or to raise an inference of retaliation.

Second, as discussed in the ADA section above, Plaintiff cannot show that she performed her job satisfactorily but was treated differently from similarly situated employees who did not request FMLA leave. Plaintiff neither sufficiently requested FMLA, nor performed her job satisfactorily, nor did she proffer any similarly situated employees that were treated differently.

Accordingly, Plaintiff cannot support either her ADA or FMLA claims.

IT IS THEREFORE ORDERED THAT:

    (1) Defendant's Motion for Summary Judgment (#35) is GRANTED.

    (2) This case is terminated.

Entered this 21st day of December, 2012

s/ Michael P. McCuskey

MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE